## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE SEARCH OF:<br><br>1 GRAY IPHONE IMEI: #352976094202954; 1 SIM CARD LABLED "ULTRA MOBILE" #8901260093134739466M01-03; 1 SIM CARD LABELED T #890126018373536644M29-01TM9263, CURRENTLY LOCATED AT  324 RIVER ROAD, BEDFORD, NH | No. 20- mj-42-AJ |

**AFFIDAVIT OF TASK FORCE OFFICER RICHARD SPRANKLE IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, Richard Sprankle, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I am a Task Force Officer with the United States Drug Enforcement Administration ("DEA") and have been so employed since 2019. I am currently assigned to the Manchester New Hampshire District Office. I am currently employed by the Nashua New Hampshire Police Department as a police officer and have been since 2010. My duties and responsibilities as a DEA Task Force Officer include the investigation of federal crimes, including violations of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846.

2.      During my assignment with DEA, as well as my time with the Nashua New Hampshire Police Department, I have participated in numerous investigations relating to the distribution of controlled substances, including heroin, fentanyl, oxycodone, cocaine, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code. Based on my training and experience, I am familiar with the manner and means commonly

employed by drug traffickers and drug trafficking organizations to conduct their illegal activities, including purchasing, manufacturing, storing, and distributing controlled substances, the laundering of illegal proceeds, and the efforts of persons involved in such activities to avoid detection by law enforcement.  I am also familiar with the terminology and slang commonly employed by drug traffickers.  I have observed and examined cocaine, cocaine base ("crack"), heroin, and fentanyl as well as other controlled substances.  I am aware of the street prices for these substances, the methods of packaging, and the jargon used in the drug trade.

3.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities.  I am familiar with the manner in which narcotics traffickers use coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone.

**PURPOSE OF AFFIDAVIT**

4.      As set forth in the January 27, 2020, Affidavit in Support of Application for a Complaint, incorporated by reference herein and provided as Attachment A, Gabriel DIAZ NIVAR ("DIAZ NIVAR"), along with a co-conspirator, identified at that time as Luis PEREZ (aka, Luis Manuel DIAZ NIVAR), was arrested on January 27, 2020 for Conspiracy to Distribute a Controlled Substance.  This affidavit is being submitted in support of an application for a search warrant for electronic equipment seized from Gabriel DIAZ NIVAR following his arrest on January 27, 2020, specifically:

        a.      A Gray IPhone, bearing what is believed to be an International Mobile Equipment Identity number ("IMEI") with serial number 352976094202954; and

        b.      Two SIM Cards found within the IPhone protective case:

- SIM card 1 labeled "Ultra Mobile" # 890126009 3134739466 M01-03

- SIM card 2 labeled - T - #8901260183 773536644 M29-01 TM9263,

(collectively, "the Equipment"), currently in the possession of law enforcement officials, as described in Attachment B.

5.    There is probable cause to believe that the Equipment contains evidence and instrumentalities of the crime for which Gabriel DIAZ NIVAR was arrested as described in Attachment A.  The facts in this affidavit are based on my personal observations and review of records, my training and experience, and information obtained from other law enforcement officials and witnesses.  The purpose of this affidavit is limited to showing that probable cause exists to support the issuance of a search warrant.  Accordingly, while this affidavit contains all the material information I am aware of that is pertinent to the requested search warrant, it does not include every fact known by me or other investigators concerning the investigation.

## PROBABLE CAUSE

### Background

6.    On January 27, 2020, Special Agent Galen Doud and I met with Nashua Cooperating Individual 20-4, hereafter referred to as CI for the purposes of this affidavit. CI said he/she bought "dope" (heroin/fentanyl) from a male he/she knew as "Fish" on one occasion.  At that time, "Fish" was working as a "runner"(an individual who sells drugs for a drug trafficking organization) selling controlled substances in New Hampshire and Maine.  "Fish" was subsequently arrested for distributing controlled substances, thereby creating an opening for a new "runner" or distributor for the New Hampshire area.  CI stated that after "Fish" was arrested, roughly two months ago, CI received a phone call from a Hispanic male who said he was from

the "Dominican Cartel."  CI said this male is the individual who sold to "Fish" during the one

time CI bought from "Fish."  CI then began to buy heroin/fentanyl directly from the male, later

identified as Luis PEREZ (aka, Luis Manuel DIAZ NIVAR) though unknown to CI, for

redistribution in New Hampshire.

7.      CI said he/she bought $10,000 worth of heroin/fentanyl every three to five days,

involving quantities between 58 to 64 "fingers" (a "finger" is a ten gram quantity of

heroin/fentanyl).   CI said PEREZ came from Haverhill or Lawrence, and directed CI to meet at

the "bus station" in Lowell, later identified as the Robert B Kennedy Transfer Center, 145

Thorndike Street, Lowell.  CI said PEREZ arrived on the bus and got in CI's vehicle where CI

provided ten $1,000 stacks of cash in exchange for the heroin/fentanyl.  CI said after driving a

short distance, PEREZ got out of CI's vehicle and returned to the bus.  CI said he/she usually

placed an order the day before and then met in Lowell the following morning to complete the

drug transaction.

### Controlled Buy & Arrest

8.      On January 26, 2020, Special Agent Doud and I met with CI at a predetermined

location in Concord, NH, and traveled together to the bus station in Lowell where CI provided an

in-depth description of how the drug transactions typically occur.  SA Doud and I then drove CI

back to the predetermined location in Concord, NH, where we directed CI to place an order for

the following day, January 27, 2020.   We instructed CI to place the same order he/she typically

places and not to deviate from the normal routine of the transactions.  At approximately 2:42pm,

CI placed a text to the phone,          1163, and set up a purchase of 58 "fingers" of

heroin/fentanyl for $10,000 at the bus station in Lowell at 10:40 am.

9.      On January 27, 2020, assisting members of the Drug Enforcement

Administration, Manchester District Office (MDO), Massachusetts State Police Transportation

Drug Unit (MSP TDU), and Lowell Police Department (LPD) set up surveillance in the area of the Robert B. Transfer Center in Lowell.  I remained with the CI at a predetermined location along with DEA Group Supervisor (GS) Noah Herzon and TFO Nicholas Turner.  Agents searched CI for weapons, money, and contraband, without incident.  At that time, I was acting in an undercover capacity for an anticipated "Buy Bust" operation (a felony arrest following a controlled purchase) on PEREZ.

       10.     I entered into the driver's seat of CI's vehicle while CI entered into the right front passenger seat.  I had $1,000.00 prerecorded United States Currency, which I mixed with a larger sum of false currency to appear as a stack of $10,000.00 United States Currency. I also had an audio/video recording device, which I positioned within the CI's vehicle to have the best view of the interior. Once the surveillance was established in the area of the bus station and Thorndike Street, I drove CI in CI's vehicle to the agreed upon meet location. Upon arrival at approximately 10:29am, under my direction, CI sent a text to the phone,      163, stating, "Here".  CI received a response, "Me 10 min," which was believed to mean that the runner was 10 minutes away.

       11.     A short time later, I observed a bus pull up in the same location that CI previously described.  I watched a Hispanic male, later identified as PEREZ, exit the bus wearing a black sweatshirt, black flat brimmed hat, and grey sweatpants.  PEREZ followed the same route CI previously described.  I also observed a second subject wearing a black jacket, grey knit hat, and light grey sweatpants following a short distance behind PEREZ.  This male was later identified as Gabriel Alexander DIAZ NIVAR (DOB     according to a Dominican Republic Identification card provided following his subsequent arrest.  I observed the two communicating as PEREZ looked back to DIAZ NIVAR while approaching CI's vehicle.  I provided the

descriptions of these two males over the audio/video recording to assisting surveillance members.  CI identified PEREZ as the male from whom he typically purchased heroin/fentanyl.

12.     When PEREZ reached the passenger side of the vehicle, he told CI, who had his/her window rolled down, "he works for me," as he turned and nodded towards DIAZ NIVAR.  PEREZ then continued to pass the vehicle and walked towards the bus station.  DIAZ NIVAR entered into the right rear passenger seat of CI's vehicle.  Once inside, he immediately removed two green cellophane packages from his hooded sweatshirt under his jacket.  I put the vehicle into drive and pulled forward as CI handed the "$10,000" stack to DIAZ NIVAR.  In exchange, DIAZ NIVAR handed the two cellophane wrapped packages to CI.  Based on my training and experience, the wrapped items within the green cellophane appeared consistent with a large quantity of "fingers."   Later, closer inspection confirmed that the individual packages inside the green cellophane wrapping contained a tan substance consistent with heroin/fentanyl. I used a predetermined indicator to notify assisting units that the transaction had been made and pulled the vehicle over to the curb.

13.     Within seconds, assisting members of the MDO, MSP TDU, and LPD made contact with all occupants of the vehicle and identified themselves as police officers.  DIAZ NIVAR was taken into custody.  PEREZ was taken into custody near the bus station.  At that time, he was identified as Luis PEREZ by his Massachusetts driver's license.   PEREZ was also in possession of the phone, ███-1163, which CI had texted to arrange the previous drug transactions.

14.     During a post-arrest search, agents located on DIAZ NIVAR's person a Gray IPhone, bearing what is believed to be an International Mobile Equipment Identity number

("IMEI") and bearing the serial number 352976094202954; and Two SIM Cards found within the IPhone protective case: SIM card 1 labeled "Ultra Mobile" # 890126009 3134739466 M01-03 and SIM card 2 labeled - T - #8901260183 773536644 M29-01 TM9263.

## LOCATION OF THE EQUIPMENT

15.     The Equipment is currently in the possession of agents from DEA Manchester District Office, as described in Attachment B.

## PROBABLE CAUSE TO BELIEVE THAT THE EQUIPMENT CONTAINS EVIDENCE AND INSTRUMENTALITIES OF A CRIME

16.     Based on my training and experience, and information provided to me by other agents, I am aware that individuals involved in drug trafficking frequently use computers and other electronic devices, including smartphones, to carry out, communicate about, and store records related to drugs and drug trafficking to include storing these items on SIM cards.    Drug trafficking tasks are frequently accomplished through text messages, encrypted messages, and photographs communicated by telephone.  Based on my training and experience, I know that dealers and others involved in the drug trade frequently utilize multiple mobile phones in connection with their illegal drug activity.  For example, individuals involved in drug trafficking frequently utilize one phone to communicate with drug customers and another phone to communicate with other drug-related associates (*e.g.*, suppliers, runners, organizers).  Individuals involved in drug trafficking frequently change their phones and/or phone numbers, and their utilization of multiple phones can mitigate the disruption associated with these changes (for example, a dealer can change the phone used to communicate with drug suppliers or organizers while not changing the phone used to communicate with customers, or vice versa).  Multiple SIM cards are also commonly used to thwart the use of electronic detection.

17.     Based on my training, experience, and information provided by other law

7

enforcement officers, I know that many smartphones such as IPhones (which are included in Attachment B's definition of computer "hardware") can now function essentially as small computers.  Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. This data and information can be stored on SIM cards.

18.     Based on my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

19.     Based on my training and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

     a.  Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

     b.  Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or

"recovery" file.

c.   Wholly apart from user-generated files, computer storage media, in particular computers' internal hard drives, contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.   Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

20.     As discussed above, the Equipment is currently being stored by investigators at their facilities as described in Attachment B.  From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the investigators' possession on January 27, 2020.

**CONCLUSION**

21.     Based on the information described above, I believe that the Equipment, as described in Attachment B, contains evidence, and instrumentalities of drug trafficking, as

described in Attachment C.

I, Richard Sprankle, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

/s/ Richard Sprankle
Richard Sprankle
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me,
this 7th day of February, 2020.

/s/ Andrea K. Johnstone
Honorable
United States Magistrate Judge
District of New Hampshire

10

**ATTACHMENT A**

**AFFIDAVIT IN SUPPORT**

**OF**

**APPLICATION FOR CRIMINAL COMPLAINT**

I, Galen Doud, being first duly sworn, state under oath as follows:

Preface

1. The following affidavit is furnished to support the criminal complaint for the following:

**Gabriel Alexander Diaz-Nivar ("DIAZ-NIVAR")**

**DOB** ▮▮▮▮▮▮

**AND**

**Luis Perez ("PEREZ")**

**DOB** ▮▮▮▮▮▮

2. Based upon information obtained from a variety of sources, including a confidential source, physical surveillance, intercepted communications, and controlled purchases of drugs, I submit that there is probable cause to believe that **DIAZ-NIVAR** and **PEREZ** and others known and unknown have committed or are believed to be committing offenses involving the sale, and possession with the intent to sell the controlled drug cocaine in violation of 21 U.S.C. §§ 846, 841(a) and (b)(1)(A)(vi)(distribution of controlled substances).

Introduction

3. I have been a Special Agent with the Drug Enforcement Administration ("DEA") since May 2017, and I am currently assigned to DEA's Manchester District Office. I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. While attending the DEA Training Academy, I received training on a multitude of topics pertaining to drug investigations. My primary duties as a DEA Special Agent include investigating federal crimes and violations of

the Controlled Substances Act at the local, national, and international level.  I have been involved in numerous drug investigations, including wiretap investigations, where I have analyzed telephone toll records and subscriber information.  I have also participated in both physical and electronic surveillances, including monitoring cell phone "pings," the purchase of illegal drugs, enforcement operations including the execution of both search and arrest warrants, and interviews of sources of information, confidential sources, drug traffickers, and other members of drug trafficking organizations.

4. Prior to being employed as a DEA Special Agent, I was employed as a full time police officer with the City of Nashua, New Hampshire Police Department for approximately four and one-half years.  I made several hundred arrests and initiated, conducted, and assisted in even more criminal investigations, many of which involved drug violations.  I worked as a police officer in a uniformed and plain clothed capacity, and debriefed numerous defendants and cultivated many sources of information and confidential sources pertaining to drug trafficking organizations.  I have also attended multiple trainings about drug related investigations, and relevant topics associated with drug investigations.  I have a Bachelor of Science degree in Criminal Justice from Northeastern University.

5. Based on my training, education, and experience, I am familiar with the manner and means commonly employed by drug traffickers and drug trafficking organizations to conduct their illegal activities, including purchasing, manufacturing, storing, and distributing controlled substances, the laundering of illegal proceeds, and the efforts of persons involved in such activities to avoid detection by law enforcement.  I am also familiar with the terminology and slang commonly employed by drug traffickers.  I have observed and examined cocaine, cocaine base ("crack"), heroin, and fentanyl as well as other controlled substances.  I am

aware of the street prices for these substances, the methods of packaging, and the jargon used in the drug trade.

<u>Confidential Informant</u>

6. In January of 2020, investigators became aware of a confidential informant, that I will refer to in this affidavit as CS in order to protect the confidential informant's identity, as the confidential informant fears for CS's safety if investigated parties learned of CS's identity and activities.  CS was interested in providing information to the Nashua Police Department because CS is seeking consideration on pending drug sales charges, Distribution of a Controlled Substance, suspected fentanyl.  Due to the lethal dangers associated with fentanyl, this substance was not field tested. The confidential informant has a criminal history to include: Witness Intimidation in 2016 and Larceny and Possession with Intent to Distribute in 2018.  The confidential informant is receiving no financial remuneration for CS's information or activities in this investigation.

<u>*Controlled Buy*</u>

7. On **1-26-2020,** following instructions from detectives, **while at a predetermined location in New Hampshire,** a Nashua Police Department Confidential Source (CS) sent a text message to ▓▓▓▓ 1163, an identified heroin and/or fentanyl source of supply.  The CS explained IT had previously purchased heroin and/or fentanyl from a Hispanic male utilizing this phone number for the last several months, specifically, since approximately November 2019.  The CS said the 1163 number was a new number provided to the CS recently.  The CS explained IT often would meet this source of supply at the Lowell bus station during the morning to early afternoon and purchase anywhere between 58 to 64 fingers (a finger is a street term for a ten gram quantity of heroin and/or fentanyl) for $10,000 approximately every three to five

days.  The CS said the source of supply would get off of a bus, get into the CS's vehicle,

complete the transaction, and quickly get out of the CS's vehicle and return towards the bus

station.  The CS further identified the Lowell bus station as the Lowell Regional Transit

Authority, 115 Thorndike Street, Lowell, Massachusetts.  The CS texted, "Yo can i see you

tomorrow," to which the 1163 phone replied, "Yes," and, "News."  The CS then texted, "Bus

station 58 for 10000 at 1030."  The 1163 phone replied, "Ok good brother."

8.   On January 27, 2020, the CS again met with investigators.  The CS advised the 1163 phone

texted, "10:40?????"  The CS was searched by investigators and found to not possess any

weapons or contrand???.  The CS and an undercover law enforcement officer (UC), under

surveillance by other investigators, proceeded to the Lowell Regional Transit Authority and

parked.  At approximately 10:40a.m., surveillance investigators observed a bus arrive in the

parking lot, before two Hispanic males wearing dark clothing got off of this bus and

approached the UC and CS' vehicle.  One male, subsequently identified as PEREZ,

approached the passenger's side of the UC and CS' vehicle and stated to the UC and CS

something to the effect of, "He works for me," motioning towards the other Hispanic male,

subsequently identified as DIAZ-NIVAR, got into the rear passenger's seat of the UC and

CS' vehicle.  A short time after DIAZ-NIVAR entered the UC and CS' vehicle, the CS

provided a pre-determined amount of money to DIAZ-NIVAR, and DIAZ-NIVAR provided

the CS with two, green saran wrapped packages containing approximately 580 grams of

suspected fentanyl.

9.   Following this transaction, investigators approached the UC and CS' vehicle, and arrested

DIAZ-NIVAR.  The drugs were recovered, and the pre-recorded money was located in

DIAZ-NIVAR's from right shirt pocket.  Investigators observed the two green, saran

wrapped packages contained multiple "fingers" of suspected fentanyl.  Based on

investigators training and experience, investigators observed these two green, saran wrapped

packages to be consistent with fingers of suspected fentanyl.  It should be noted the CS

previously stated to investigators that IT purchases two packages of drugs from this source of

supply.  One package would typically contain 30 fingers, and the second package would

contain the remaining amount of fingers.

10. A short time later, other investigators located PEREZ near the main entrance of the bus

station.  Both the UC and the CS returned to the bus station, and both the UC and CS

independently identified PEREZ.  Additionally, the CS said that PEREZ is the heroin and/or

fentanyl source of supply whom the CS has bought from previously.  Investigators

approached PEREZ and arrested him without incident.  PEREZ had a phone on his person

which was seized.  Investigators later called the 1163 phone and determined this phone was

on PEREZ's person.

11. As part of this investigation, DEA personnel have not conducted a presumptive field test of

the powdered substances encountered on January 27, 2020, which, for the reasons indicated

above, there is probable cause to believe are controlled substances, as defined by the

Controlled Substances Act of 1970, as amended, 21 U.S.C. § 801 et seq. The decision to not

conduct such a test was due to the significant threat to law enforcement personnel, first

responders, and members of the public of exposure to fentanyl, fentanyl-related substances,

synthetic opioids, and other powders which may be composed in full, or in part, of one of

these substances. The most widely used methods of field testing by law enforcement agencies

require that a small amount of the questioned substance be removed from its packaging or

container so it can be introduced to a reagent or placed on a scanner. This process may result

in some of the questioned substance being spilled or becoming airborne, which would subject those in the immediate vicinity to inadvertent physical contact with or inhalation of the questioned substance. The DEA has recently determined that the risks associated with possible accidental exposure that may occur during field testing are too great to justify such tests. Accordingly, the DEA has directed its personnel that only trained personnel, in a lab environment, with necessary personal protective equipment (PPE), should be conducting such tests, and they should be conducted in a controlled, safe environment. Conducting tests in an uncontrolled environment, and without proper PPE, poses an undue risk and could result in serious bodily injury or death to those unknowingly exposed to fentanyl, fentanyl-related substances, or synthetic opioids.

<u>Conclusion</u>

12. Based upon my training and experience, and the forgoing information, there is probable cause to believe that **DIAZ-NIVAR and PEREZ** have committed offenses involving conspiracy to sell the controlled drug fentanyl in violation of Title 21 U.S.C. §§ 846 and 841.

**ATTACHMENT B**

**Description of Equipment to Be Searched**

The Equipment to be searched consists of the following electronic equipment seized from DIAZ

NIVAR pursuant to his arrest on January 27, 2020:

    a.    A Gray IPhone, bearing what is believed to be International Mobile

Equipment Identity number ("IMEI") iPhone bearing serial number

352976094202954; and

    b.    Two SIM Cards found within the IPhone protective case:

    -    SIM card 1 labeled "Ultra Mobile" # 890126009 3134739466

M01-03

    -    SIM card 2 labeled - T - #8901260183 773536644 M29-01

TM9263

The Equipment is located at the DEA Manchester, New Hampshire District Office, in secured

storage.

**ATTACHMENT C**

**Permissible Retrieval Techniques**

The government, and anyone whose assistance the government may require, may conduct an off-premises search of the Equipment using whatever data analysis techniques appear necessary to locate and retrieve the evidence described herein, even if those techniques render the Equipment inoperable.  To the extent the Equipment is damaged beyond repair, password protected, locked or otherwise inoperable and traditional data analysis techniques will not work, the government may use a data analysis technique referred to as "chip off."  "Chip off" is a process where the BGA (Ball Grid Array or memory chip) chip is removed from the cell phone/mobile device using heat or an infrared light and the chip itself is then analyzed.  This is a destructive process that will render the Equipment unusable, but it may allow for the complete collection of all data stored on the memory chip.

**Items to Be Seized**

1.     All records, in whatever form, and tangible objects that constitute evidence, or instrumentalities of 21 U.S.C. § 841(a)(1) (possession and distribution of controlled substances); between April 2019 and present, including those related to:

a)     Records of drug trafficking activities;

b)     lists of customers and related identifying information;

c)     any information recording schedule, whereabouts, or travel, including calendar, e-mails, cell tower, and GPS data;

d)     all bank records, checks, credit card bills, account information, and other financial records;

    e)       the identity, location, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

    f)       text messages and instant messages.

2.      Evidence of user attribution showing who used or owned the Equipment at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Records evidencing the use of the Internet, including:

    a)       records of Internet Protocol addresses used;

    b)       records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    c)       As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

**Definitions**

For the purpose of this warrant:

A.    "Equipment" means any hardware, software, storage media, and data.

B.    "Hardware" means any electronic device capable of data processing (such as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.    "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.    "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or SIM memory card).

E.    "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.    "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

**Return of Seized Equipment**

If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

If equipment cannot be returned, agents will make available to the equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally-identifying information of victims; or instrumentalities of crime.